NATIONAL COALITION FOR STUDENTS WITH DISABILITIES EDUCATION AND LEGAL DEFENSE FUND, Plaintiff,

v.

William SCALES, Dr., In his individual capacity, and C.D. Mote, Dr., In his individual capacity Defendants.

Civil Action No. AW–00–3309.

United States District Court, D. Maryland, Southern Division.

July 5, 2001.

Leonard J. Bonner, Washington, DC, Michael J Beattie, Fairfax, VA for Plaintiff.

Dawna M. Cobb, Office of the Attorney General, Baltimore, MD for Defendants.

## MEMORANDUM OPINION

WILLIAMS, District Judge.

Plaintiff, the National Coalition for Students with Disabilities Education and Legal Defense Fund ("NCSD") brings this action to challenge the voter registration procedures established by the Office of Disability Support Services ("DSS") at the University of Maryland at College Park (the "University"). Defendant Williams Scales is the Director of DSS. Defendant C.D. Mote is the President of the University. Currently pending before the Court is Defendants' Motion to Dismiss the First Amended Complaint, or in the alternative for Summary Judgment. The motion has been fully briefed by all parties. No hearing is deemed necessary. *See* Local Rule 105.6. Upon consideration of the arguments made in support of, and opposition to, the respective motions, the Court makes the following determinations.

## I. *FACTUAL BACKGROUND*

### A. *The National Voter Registration Act of 1993 (NVRA)*

Congress enacted the National Voter Registration Act of 1993 (NVRA), 42

U.S.C. § 1973gg *et seq.* "to establish procedures that will increase the number of eligible citizens who register to vote in elections for Federal office" and "to ... enhance[ ] the participation of eligible citizens as voters in elections for Federal office." 42 U.S.C. § 1973gg(b). To effectuate its goals, the NVRA requires states to establish a simplified system for voter registration in federal elections by mail, at state offices designated as voter registration agencies ("VRAs"), and on driver's license applications. *See id.* § 1973gg–3. The NVRA delineates the manner in which these systems must operate, the kind of information required on voter registration forms, and the procedures by which states may remove citizens from the federal voter rolls. *See id.* §§ 1973gg–3(c)(2); 1973gg–6(a)(3)(4); 1973gg–7(b).

Since its enactment, several states have mounted challenges to the NVRA and, each time, the federal courts have upheld the validity of the law and ordered state compliance with its express provisions. *See National Coalition for Students with Disabilities Educ. and Legal Defense Fund v. Gilmore*[1], 152 F.3d 283 (4th Cir. 1998); *Association for Comm. Organizations for Reform Now (ACORN) v. Miller,* 129 F.3d 833 (6th Cir.1997); *Voting Rights Coalition v. Wilson,* 60 F.3d 1411, 1412 (9th Cir.1995), *cert. denied,* 516 U.S. 1093, 116 S.Ct. 815, 133 L.Ed.2d 759 (1996); *ACORN v. Edgar,* 56 F.3d 791 (7th Cir.1995). Particular to the case at hand is the requirement that "[e]ach State shall designate as voter registration agencies ... all offices in the State that provide State-funded programs primarily en-gaged in providing services to persons with disabilities." 42 U.S.C. § 1973gg–5(a)(2)(B). By statute, in addition to the services normally rendered, these mandatory VRAs must provide the following services: (i) distribution of mail voter registration application forms; (ii) assistance to applicants in completing voter registration application forms, unless the applicant refuses such assistance; and (iii) acceptance of completed voter registration application forms for transmittal to the appropriate State election official. 42 U.S.C. § 1973gg–5(a)(4)(A). In *Gilmore,* the Fourth Circuit held that state-funded offices of public universities that offer "programs primarily engaged in providing services to" disabled students "qualify for designation as voter registration agencies under § 42 U.S.C. § 1973gg–5(a)(2)(B)." 152 F.3d at 293. Defendants concede that, under this holding, DSS is properly designated as a mandatory VRA.

NCSD is a non-profit advocacy group committed to promoting educational opportunities for and the legal rights of students with disabilities. Its members consists of students with disabilities and other concerned parties similarly dedicated to its goals. According to Plaintiff's Amended Complaint, a blind student, Erica Tracy, entered DSS and requested assistance in registering to vote in the November of 2000 federal election. The DSS office informed her that no voter registration forms were available and that the office did not provide voter registration assistance. The Amended Complaint does not allege that Ms. Tracy was a student at University of Maryland. According to the

---

1. *See National Coalition for Students with Disabilities Educ. and Legal Defense Fund v. Gilmore,* 190 F.3d 600, 601 (4th Cir.1998) (changing the appellees in *National Coalition for Students with Disabilities Educ. and Legal Defense Fund v. Allen,* 152 F.3d 283 (4th Cir.1998) to read: JAMES S. GILMORE, III, acting in his official capacity as Governor of Virginia; William A. Allen, acting in his official capacity as Director of the State Council on Higher Education; Cameron P. Quinn, acting in her official capacity as Secretary of the State Board of Elections).

amendment complaint, approximately 21 disabled students registered at the University of Maryland were not distributed voter registration forms or offered voter registration assistance in accordance with the NVRA. It is NCSD's position that, as a mandatory VRA, DSS is required to offer voter registration services and assistance to all students with disabilities each time they apply for services, renew, or re-certify their services, or submit a change of address. Thus, in response to Ms. Tracy's complaint, NCSD brought this action seeking declaratory relief that the DSS is not in compliance with NVRA and an injunction to compel DSS to conform its conduct to the requirements of the law.

## II. *DISCUSSION*

 Seeking dismissal pursuant to Fed.R.Civ.P. 12(b)(6), the Defendants' motion attacks the standing of the Plaintiff and the viability of the asserted claims in the complaint. Defendants frame their motion as a motion to dismiss, or in the alternative motion for summary judgment. The Court notes that discovery has not commenced in this action. Ordinarily, "[a] district court should refuse to grant summary judgment when an opposing party needs additional time to complete discovery and properly respond to the motion." *HealthSouth Rehabilitation Hosp. v. American Nat. Red Cross,* 101 F.3d 1005, 1009 (4th Cir.1996). The availability of additional time for discovery is predicated upon the nonmoving party complying with the requirements of Rule 56(f). *See* Fed. R.Civ.P. 56(f); *Evans v. Technologies Applications & Service Co.,* 80 F.3d 954 (4th Cir.1996). To avoid or delay summary judgment to conduct discovery, a plaintiff needs to submit an affidavit stating why certain evidentiary facts could not be pre-

sented with its motion. *See* Fed.R.Civ.P. 56(f); *Pine Ridge Coal Co. v. Local 8377, United Mine Workers of America,* 187 F.3d 415 (4th Cir.1999). Plaintiff has submitted a sworn statement from Michael Beattie adequately explaining its need for discovery. Under the circumstances, the Court believes that summary judgment is not appropriate at this stage in the litigation and will review the Defendants' motion consistent with the standard of review established for challenges under Rules 12(b)(6).

In the instant case, Defendants challenge Plaintiff's complaint on several grounds. First, Defendants allege that Plaintiff lacks standing to represent its members. Second, Defendants argue that Plaintiff has not satisfied the notice requirements of the NVRA. Further, Defendants maintain the facts, as alleged by Plaintiff, do not give rise to a past, present, or future violation of the NVRA because (1) the NCSD members that requested voter registration services are not registered students at the University and (2) its current voter registration procedures comply with NVRA.

As to Plaintiff's § 1983 claim, Defendants maintain that the comprehensive enforcement scheme of the NVRA precludes a 42 U.S.C. § 1983 action based upon a violation of its provisions. Fourth, Defendants argues that Plaintiff cannot sustain a § 1983 action against Defendant Mote due to his lack of personal involvement. Lastly, Defendants state that Plaintiffs' § 1983 action is barred by the Eleventh Amendment because it is truly against the Defendant in their official capacities.[2]

### A. *Legal Standard*

It is well established that a motion to dismiss under Rule 12(b)(6) of the Federal

---

**2.** Defendants initially asserted the defense of qualified immunity to Plaintiff's § 1983 complaint. In their reply, Defendants retracted this argument. (Defs. Reply at 2 n. 1)

Rules of Civil Procedure should be denied "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of [its] claim which would entitle [it] to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). The function of a motion to dismiss for failure to state a claim is to test the legal sufficiency of the complaint, and not the facts that support it. *See Neitzke v. Williams*, 490 U.S. 319, 326–27, 109 S.Ct. 1827, 104 L.Ed.2d 338 (1989). A Rule 12(b)(6) motion "does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Republican Party v. Martin*, 980 F.2d 943, 952 (4th Cir.1992). In determining whether to dismiss the complaint, this Court must view the well-pleaded material allegations in a light most favorable to the plaintiff, with the alleged facts accepted as true. *See Chisolm v. TranSouth Financial Corp.*, 95 F.3d 331, 334 (4th Cir.1996). However, the Court is not required to accept as true the legal conclusions set forth in a plaintiff's complaint. *Edwards v. City of Goldsboro*, 178 F.3d 231, 243–44 (4th Cir.1999).

### B. *Standing*

"Article III, § 2, of the Constitution extends the 'judicial Power' of the United States only to 'Cases' and 'Controversies.'" *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 102, 118 S.Ct. 1003, 1016, 140 L.Ed.2d 210 (1998). Consistent with Supreme Court precedent interpreting the "case or controversy" requirement of Article III, "[s]tanding to sue is part of the common understanding of what it takes to make a justiciable case." *Id.* "[T]he party invoking federal jurisdiction bears the burden of establishing its existence." *Steel Co.*, 523 U.S. at 104, 118 S.Ct. at 1017.

■ Organizations are entitled to bring suit in federal district courts based upon injuries to their members and on their own behalf for injuries they have sustained. *Compare United Food and Commercial Workers Union Local 751 v. Brown Group, Inc.*, 517 U.S. 544, 553, 116 S.Ct. 1529, 1534, 134 L.Ed.2d 758 (1996) *with Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379, 102 S.Ct. 1114, 1124, 71 L.Ed.2d 214 (1982). In order to sue based on injuries to itself, the organization must meet the same standing test that applies to individuals. *See Havens Realty Corp.*, 455 U.S. at 378, 102 S.Ct. at 1124; *Irish Lesbian and Gay Organization v. Giuliani*, 143 F.3d 638 (2d Cir.1998). In the case of individuals, "Article III of the Constitution limits the federal judicial power to 'Cases' or 'Controversies,' thereby entailing as an 'irreducible minimum' that there be (1) an injury in fact, (2) a causal relationship between the injury and the challenged conduct, and (3) a likelihood that the injury will be redressed by a favorable decision." *United Food and Commercial Workers Union Local 751*, 517 U.S. at 551, 116 S.Ct. at 1533. In *Havens Realty Corp.*, the Supreme Court found that allegations in the organizational plaintiff's complaint that the defendant's allegedly discriminatory practices (1) frustrated the organization's efforts to assist equal access to housing and (2) forced it to devote significant resources to identify and counteract those unlawful practices was sufficient to confer standing on a motion to dismiss. 455 U.S. at 379, 102 S.Ct. at 1124. The Court stated that "[s]uch concrete and demonstrable injury to the organization's activities—with the consequent drain on the organization's resources—constitutes far more that simply a set back to the organization's abstract social interests." *Id.*

■ Here, the organization's goals are to "enhance educational opportunities and

strengthen the legal rights and remedies of students with disabilities" and "expand voter registration among students with disabilities on college campuses . . . ." (Pl. Am. Compl. at 2–3.) The Plaintiff's complaint states as follows:

> The plaintiff has been aggrieved by the State's refusal to comply with NVRA because such failure forces plaintiff to expand additional resources to conduct voter registration efforts at the University of Maryland at College Park. If the University has complied wit the NVRA, NCSD would not have to devote time and money towards voter registration efforts in College Park.

By implication, an enumerated goal of the NCSD is to strengthen the rights and remedies of students with disabilities attempting to exercise their right to vote. "[A]ccepting as true all material allegations of the complaint," the Court finds that the allegations that the University's noncompliance frustrates these goals and requires the organization to expend resources in facilitating the registration of disabled persons that they otherwise would spend in other ways is sufficient to show an actual or threatened injury in fact that is fairly traceable to the alleged illegal action and is likely to be redressed by a favorable court decision ordering injunctive relief.[3] *Warth v. Seldin,* 422 U.S. 490, 501, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1975). *See also ACORN v. Fowler,* 178 F.3d 350, 360 (5th Cir.1999) (stating association would have standing to sue on its own behalf "if it had proved (1) that it provided counseling services to the mental-ly disabled affected by the defendant's act and (2) that it had to devote resources to combating the defendant's alleged [violation]") (interpreting *Cleburne Living Ctr., Inc. v. City of Cleburne,* 726 F.2d 191 (5th Cir.1984)).

While NCSD has alleged sufficient facts to confer standing under the NVRA, such allegations are not sufficient to support standing on its own behalf on the § 1983 claim. In *Mackey v. Nationwide Insurance,* 724 F.2d 419, 421–423 (4th Cir.1984), the Fourth Circuit recognized that additional prudential considerations limit the availability of third-party standing in actions brought under § 1983 of the Civil Rights Act of 1871. In *Mackey,* the court explained that "courts should not be called upon to decide questions of broad social import in cases in which no individual rights will be vindicated, and access to the federal courts should be limited to those litigants best suited to assert the claims." *Id.* at 421–22. The court reasoned that, where there is no impediment to actions by the directly afflicted victims and denial of standing would not insulate the defendant from legal accountability for the alleged depravation of the federally-protected right, the persons best suited to challenge the practices impinging on individual rights are the direct victims of the alleged illegal practices. *Id.* at 422.

In some instances, the nature and severity of an individual's disability may impede his or her access to the courts. However, the Court declines to adopt a stereotypical view as to the general capabilities of all persons with disabilities to seek redress

---

**3.** The Court notes that, on a motion to dismiss, the Plaintiff's allegations of injury are presumed true. By contrast, on a proper motion for summary judgment following discovery, "to demonstrate standing, [the organizational plaintiff] must point to specific summary judgment evidence showing that it was 'directly affected' by [the State's] alleged NVRA violations." *Fowler,* 178 F.3d at 357–361. Furthermore, at trial, Plaintiff will have to demonstrate that it has indeed suffered impairment in its role of facilitating the registration of disabled individuals before it will be entitled to judicial relief. *See Havens Realty Corp.,* 455 U.S. at 379 n.21, 102 S.Ct. at 1125 n. 21.

from the courts on their own accord. Here, there record fails to indicate any barrier preventing the alleged direct victims of the NVRA violations from bringing an action on their own behalf. In fact the affidavit of one of the alleged victims dispels such notions. From the content of the affidavit, the Court can discern no reason why the same individual cannot bring suit to vindicated his own rights arising from the alleged depravation. Nor does the Court find that Plaintiff's status as an advocacy group for all students with disabilities evidences a "special relationship with those whose rights [it] seeks to assert, such that [the Court] might overlook this prudential limitation." *Nordlinger v. Hahn*, 505 U.S. 1, 11, 112 S.Ct. 2326, 2332, 120 L.Ed.2d 1 (1992). Under such circumstances, the mere allegation of expending additional resources is insufficient to overcome the prudential concerns weighing against the grant of third-party standing under § 1983. *See Buchanan v. Consolidated Stores Corp.*, 125 F.Supp.2d 730, 738 (D.Md.2001) ("[P]rudential safeguards should be imposed against a litigant, whether person or organization, asserting the rights of another, unless the litigant is the only 'effective adversary of the unlawful discrimination.' "); *Maryland Minority Contractor's Association v. Maryland Stadium Authority*, 70 F.Supp.2d 580, 587–589 (D.Md.1998). Accordingly, the Court dismisses Plaintiff's claim brought under 42 U.S.C. § 1983 due to the lack of standing.[4]

C. *The National Voters Registration Act*

1. *Notice Requirement*

Defendants maintain the Plaintiff failed to file a complaint with the applicable Board of Elections before filing suit in federal court. According to Defendants, this failure to notify precludes the instant litigation. The NVRA provides for a private right of action to persons for violations of its provision. 42 U.S.C. § 1973gg–9(b). The section states that:

(1) A person who is aggrieved by a violation of this subchapter may provide written notice of the violation to the chief election official of the State involved.

(2) If the violation is not corrected within 90 days after receipt of a notice under paragraph (1), or within 20 days after receipt of the notice if the violation occurred within 120 days before the date of an election for Federal office, the aggrieved person may bring a civil action in an appropriate district court for declaratory or injunctive relief with respect to the violation.

(3) If the violation occurred within 30 days before the date of an election for Federal office, the aggrieved person need not provide notice to the chief election official of the State under paragraph (1) before bringing a civil action under paragraph (2).

42 U.S.C. § 1973gg–9.

Here, the complaint states that "on Wednesday, October 16, Erica Tracy, a blind NCSD member who is qualified to vote in Maryland, but is not registered to vote, attempted to register to vote at the DSS office." (Am. Compl. at 5.) Defendant points out that the complaint does not specify the year in which Ms. Tracy attempted to register. Plaintiff counters that, given the context of the complaint, the date in question is clearly October 16, 2000. Nevertheless, the language of the

---

4. As the Court dismisses Plaintiff's § 1983 claim for lack of subject matter jurisdiction, the Court does not address Defendants' alternative arguments supporting dismissal of this claim.

Amended Complaint itself makes no such specification of the year. Furthermore, a review of the year 2000 calendar reveals that October 16, 2000 was on a Monday, not a Wednesday, thereby further undermining Plaintiff's interpretation of the Amended Complaint. Nevertheless, the complaint states that "DSS has 670 clients of whom approximately 21 made their initial application for services or changed their address during the 30 days preceding the November 2000 federal elections, but none of the applicants were invited to register to vote." (Am. Compl. at 5.) Assuming all material allegations as true and even accepting the Defendants' interpretation of DSS's duties under the NVRA, the statement that DSS failed to provide voter registration services to its *clients* that *made their initial application for services* within 30 days of the November 2000 election is sufficient to dispense with the notice provisions of the NVRA. Discovery procedures may be employed to test the accuracy of these allegations.

2. *Individuals Entitled to Register Through Mandatory VRAs*

▪ It is uncontested that, in light of the Fourth Circuit's holding in *National Coalition for Students with Disabilities Educ. and Legal Defense Fund v. Gilmore*, the DSS office qualifies as a mandatory VRA. However, the Defendants maintain that the NVRA only compels it to offer voter registration services to disabled students registered at the University of Maryland. Defendants argue that the NCSD members that requested voter registration services are not University of Maryland students and, therefore, have no entitlement to voter registration services under the NVRA. According to the Defendants, absent such entitlement, Plaintiff's complaint fails as a matter of law. By contrast, Plaintiff apparently argues that the DSS office as a mandatory VRA must

offer registration services to all students with disabilities that are eligible to vote.

The Court believes that Defendants construe their obligations under the NVRA too narrowly. Neither the statute nor the legislative history indicates a congressional intent for these agencies to implement the NVRA in a fashion that adds additional barriers to the registration of disabled persons, a distinctly targeted population. It is beyond dispute that the right to vote in federal elections is an important legal right of eligible citizens. In passing the NVRA, Congress recognized that past registration procedures unfairly burdened the right of disabled persons to exercise their right to vote. An evident purpose of the provisions requiring VRAs was to cure such impediments and expand access to previously under-represented populations—including the disabled.

In establishing mandatory designations, Congress rejected a system that would "permit States to restrict their agency program and defeat a principal purpose of this Act-to increase the number of eligible citizens who register to vote." H.R. Conf. Rep. No. 103–66, at 19 (1993), *reprinted in*, 1993 U.S.C.C.A.N 105, 144. Congress intended to prevent the exclusion of "those for whom registration will be convenient and readily available—. . . persons with disabilities who do not have driver's licenses and will not come into contact with the other principle place to register under this Act." *Id.* Additionally, Congress intended states "to implement [the NVRA] in a manner that enhances the participation of eligible citizens as voters in elections for Federal office." 42 U.S.C. § 1973gg(b)(2). DSS's interpretation excludes the very citizens that the legislation was intended to benefit—eligible voters with disabilities. Such a construction injects restrictions into the language of the NVRA that conflicts with its manifest purpose. Requiring

DSS to offer voter registration services to all disabled students is consistent with NVRA's goal of eliminating "discriminatory and unfair registration laws and procedures [that] have a direct and damaging effect on voter participation in elections for Federal office and disproportionately harm voter participation ...." 42 U.S.C. § 1973gg(a)(3).

Furthermore, in *National Coalition for Students with Disabilities Educ., Legal Defense Fund v. Allen*, 152 F.3d 283, 291 (4th Cir.1998), the Fourth Circuit recognized that a visually impaired student was entitled to voter registration services from state-funded offices of state universities that primarily provide services to disabled students. 152 F.3d at 292. In *Gilmore*, the NCSD sent a member posing as a potential applicant to George Mason University to test the extent of its compliance with the NVRA. *NCSD v. Allen*, 961 F.Supp. 129 (E.D.Va.1997). Thus, in that case, it would appear that the representative member of NCSD was not a student of the university as well. Recognizing that a literal reading of § 1973gg–5 would require university offices designated as mandatory VRAs to offer voter registration services to the entire population, the court interpreted the provision to only require "an office designated as a voter registration agency ... to provide voter registration services just to those of its patrons who are disabled." 152 F.3d at 292 n. 8. Thus, while the Fourth Circuit did not expressly address the issue before the Court, the facts of the case imply that the disabled student need not be registered at the particular university in question in order to receive voter registration assistance. In the instant case, the Amended Complaint alleges DSS refused a visually impaired student's request for voter registration assistance. Assumed as true, the Court believes that such allegations can support a violation of the NVRA.

### 3. Voter Registration Services to Be Rendered

Plaintiff maintains that the NVRA requires the personnel to affirmatively offer voter registration materials to every disabled student that enters the office. Characterizing the Plaintiff's interpretation as "ludicrous," Defendants states that the NVRA only requires DSS to (1) provide a voter registration form that can be mailed to Maryland's State Board of Elections; (2) assist its students to register to vote, if the student asks for help; (3) transmit completed registration forms to the State Board of Elections; and (4) send a voter registration form to each student who reapplies for services unless that student has previously declined the DSS's assistance in registering to vote. (Def. Mot. at 5.) Thus, after the initial intake interview, Defendants interpret the NVRA to put the onus on the disabled students to ask for voter registration assistance and procure voter registration forms from the DSS Office Lobby or the offices for registration and financial aid. Information on how to register to vote is also available to the general student population via the University's telephone system and website.[5]

---

5. A review of the internet offerings of the University indicates two sources by which students, on their own initiative, may retrieve voter registration information. The Residence Halls Association website offers a sixteen-page information booklet on the NVRA, including a voter registration form, that is downloadable in PDF format. http://www.inform.umd.edu/ Student/ Campus_Activities/StudentOrg /rha/files/nvra.pdf The library website includes a hyperlink entitled *Voter Information* to the Maryland State Board of Elections Website. http://www.lib.umd.edu/ UMCP/ETC/Reference. htm1# voters. The Website provides information on how to register to vote in Maryland,

A main thrust of the legislation was for states to play a more active role in promoting the enfranchisement of eligible voters. *See* 42 U.S.C. § 1973gg(a)(2). After the initial intake interview, DSS will only offer voter registration assistance if asked by the disabled student. The NVRA states that mandatory VRAs are to provide "[a]ssistance to applicants in completing voter registration application forms, *unless* the applicant refuses such assistance." 42 U.S.C. § 1973gg–5(a)(4)(A)(ii). (emphasis added). Furthermore, the NVRA expressly states that voter registrations services must be provided with "*each* application for such service or assistance, and with *each* recertification, renewal, or change of address form relating to such service or

assistance ...." 42 U.S.C. § 1973gg–5(a)(6). The plain import of the statutory language is that, each time a disabled student of the University applies for services normally rendered by the agency, DSS must also assume its role as a VRA and contemporaneously distribute voter registration forms.[6] *See* 42 U.S.C. §§ 1973gg–5(a)(4)(A)(i);(a)(6). Equally important, DSS must make available to all disabled students assistance in completing voter registration application forms and accepting completed forms for transmittal to the Maryland State Board of Elections. *See* 42 U.S.C. § 1973gg–5(a)(4)(A)(ii)–(iii). Under its current procedures, DSS does not offer voter registrations services to its

contact information for having a voter registration mailed, and instructions for downloading a voter registration form. http://www.elections.state.md.us/citizens/registration/index.html However, the Website does not inform that disabled students may register to vote at mandatory VRAs, like DSS.

**6.** With respect to distribution of voter registration forms, a mandatory VRA must:

(A) distribute with *each* application for such service or assistance, and with *each* recertification, renewal, or change of address form relating to such service or assistance—(i) the mail voter registration application form ...[that] includ[es] a statement that—(I) specifies each eligibility requirement (including citizenship); (II) contains an attestation that the applicant meets each such requirement; and (III) requires the signature of the applicant, under penalty of perjury; or (ii) the office's own form if it is equivalent to the form described in section 1973gg–7(a)(2) of this title, *unless* the applicant, *in writing*, declines to register to vote; (B) provide a form that includes—(i) the question, "If you are not registered to vote where you live now, would you like to apply to register to vote here today?"; (ii) if the agency provides public assistance, the statement, "Applying to register or declining to register to vote will not affect the amount of assistance that you will be provided by this agency."; (iii) boxes for the applicant to

check to indicate whether the applicant would like to register or declines to register to vote (failure to check either box being deemed to constitute a declination to register for purposes of subparagraph (C)), together with the statement (in close proximity to the boxes and in prominent type), "IF YOU DO NOT CHECK EITHER BOX, YOU WILL BE CONSIDERED TO HAVE DECIDED NOT TO REGISTER TO VOTE *AT THIS TIME*."; (iv) the statement, "If you would like help in filling out the voter registration application form, we will help you. The decision whether to seek or accept help is yours. You may fill out the application form in private."; and (v) the statement, "If you believe that someone has interfered with your right to register or to decline to register to vote, your right to privacy in deciding whether to register or in applying to register to vote, or your right to choose your own political party or other political preference, you may file a complaint with _____.", the blank being filled by the name, address, and telephone number of the appropriate official to whom such a complaint should be addressed; and (C) provide to each applicant who does not decline to register to vote the *same degree* of assistance with regard to the completion of the registration application form as is provided by the office with regard to the completion of its own forms, *unless* the applicant refuses such assistance. 42 U.S.C. § 1973gg–5(a)(6) (emphasis added).

students with each application for services or make voter registration assistance available to disabled students that are not registered at the University of Maryland. The Court believes that such deficiencies are sufficient to establish a violation of the NVRA.

■ However, the Court believes that the distribution requirement of § 1973gg–5(a)(4)(A)(i) does not apply to unregistered disabled students. Under the distribution requirement, when a disabled student applies for the services of the DSS, the voter registration materials must accompany the normal provision of services, unless the student declines to register. As unregistered students are not entitled to the services traditionally provided by DSS, there is no application for services that would trigger the distribution requirement. However, no such logistical barriers complicate the other VRA functions of providing assistance in completing voter registration forms and transmitting completed forms where the disabled applicant is not registered at the University. Therefore, the Court finds that DSS must make these services available to all disabled students.

Furthermore, under the NVRA, "[a] person who provides service … shall not … make any statement to an applicant or take any action the purpose or effect of which is to discourage the applicant from registering to vote…." 42 U.S.C. § 1973gg–5(a)(5)(C). According to the Amended Complaint, DSS officials outright refused to accommodate a blind student's request for voter registration assistance. Such conduct would appear to qualify as a statement or action that would discourage her from registering to vote and, assuming its truth, sustain a violation of the NVRA. Lastly, it is unclear to the Court how the telephonic and Internet resources made available to the general public are reasonably calculated to provide registered disabled students with the voter registration services and assistance contemplated and required by the NVRA. In light of the procedures outlined in the NVRA, the Court finds that the agency practice of only offering voter registration services at the initial intake interview and placing the burden on disabled students to obtain voter registration forms and assistance afterwards does not satisfy its statutory duties.

DSS maintains that offering voter registration services contemporaneous with each application for disability services would be ludicrous and overly burdensome on its limited resources. In *ACORN v. Edgar*, 56 F.3d 791, 796 (7th Cir.1995), the State of Illinois argued that compliance with the "motor voter" provisions of the NVRA would impose excessive financial burdens on the state. Rejecting the state's complaints of fiscal burden, the Seventh Circuit noted that "Congress has passed a large number of laws altering state regulations of federal elections" which "evidently the costs of complying with … have not imposed a significant fiscal burden on the states, let alone the kind of staggering burden that might give color to Illinois' argument." 56 F.3d at 796. Here, the potential number of disabled students seeking DSS services is rather small in comparison to the massive number of eligible voters frequenting state motor vehicle agencies. In passing the NVRA, Congress balanced the potential financial burdens facing states against the right of eligible disabled voters to meaningful participation in the federal electoral process. The considerations favoring the enfranchisement of eligible federal voters prevailed. *See* 42 U.S.C. § 1973gg; H.R. Rep. 103–9, at 35–36 (1993), *reprinted in,* 1993 U.S.C.C.A.N. 105, 138–39.

■ Likewise, in response to a state's contention that the agency personnel are

"too busy" to provide voter registration services, one court stated that "[t]o allege that these two totally separate functions are somehow mutually exclusive is ridiculous and insulting to potential ... registrants." *ACORN v. Miller*, 912 F.Supp. 989, 991 (E.D.Mich.1996). As the mandatory VRA provision was enacted to make voter registration more accessible and convenient to disabled citizens, the Court finds DSS's arguments of inconvenience in providing such services an insufficient basis to justify the narrow interpretation advanced by Defendants. Equally important, even assuming that the NVRA only requires DSS to service disabled students registered at the University of Maryland at College Park, the Court finds that the allegation that DSS failed to offer voter registration services to 21 of its own clients when they initially applied for services provides a legally sufficient basis to sustain a violation of the NVRA.

### 4. *Request for Prospective Relief*

 Defendants maintain that Plaintiff cannot be entitled to declaratory or injunctive relief because it has failed to show a continuing violation of the NVRA. The Court disagrees. "Declaratory Judgment is appropriate where there is an actual case or controversy between the parties, and the declaration will finally resolve the case or controversy." *Chaghervand v. CareFirst*, 909 F.Supp. 304, 312–313 (D.Md.1995). Defendants continue to assert that the NVRA requires DSS to offer voter registration services only to disabled students that are registered at the University. Thus, by implication and the Defendants' express argument in their brief, DSS has not and will not offer voter registration services to any disabled student that is not registered at the University of Maryland at College Park. Furthermore, assuming the allegations of the complaint as true, it would appear that

even disabled students registered at the University do not receive the level of services required by the NVRA. As gathered from the affidavit of Dr. Scales, the Director of DSS, and the Defendants' brief, DSS has no intention of providing any other services beyond what it has interpreted as being the bare minimum of compliance with the NVRA. As discussed above, the Court believes that DSS has improperly narrowed the scope and extent of its obligations as a mandatory VRA and its current procedures do not comply with the NVRA. Where a state refuses to comply with the federal mandates embodied in the NVRA, declaratory and injunctive relief constitute appropriate remedies. *See Edgar*, 56 F.3d at 798..

### III. *CONCLUSION*

For the reasons stated above, the Court will grant-in-part and deny-in-part Defendants' Motion to Dismiss.